IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BRENDA ELAINE MITCHELL,
     Plaintiff,

vs.                           Case No.:  3:15cv529/MCR/EMT

FIRST TRANSIT, INC.
d/b/a ESCAMBIA COUNTY AREA TRANSIT,
     Defendant.
_____/

## SECOND REPORT AND RECOMMENDATION

Plaintiff Brenda Elaine Mitchell, proceeding pro se, brought this employment discrimination action pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") (*see* ECF No. 7).[1]  The court previously dismissed Ms. Mitchell's claims of discrimination based upon color (independent of race), age, and non-union status, as well as Mitchell's failure-to-promote claims (*see* ECF No. 43).[2]  The only remaining claims are Ms. Mitchell's claims of discrimination based upon race and sex.

---

[1] The document and page references used in this Report are those automatically generated by the court's electronic docketing system.

[2] The district court had not ruled on First Transit's motion to dismiss (ECF No. 23) at the time First Transit filed its motion for summary judgment (*see* ECF Nos. 41, 43); therefore, First Transit included argument on those claims in its motion for summary judgment.  Because the claims have now been dismissed, the undersigned will not address then.

Presently before the court is Defendant First Transit, Inc.'s motion for summary judgment (ECF No. 41). With respect to Ms. Mitchell's race and sex discrimination claims, First Transit argues that: (1) Ms. Mitchell cannot establish a prima facie case of race or sex discrimination; (2) First Transit had legitimate, non-discriminatory reasons for its employment actions; and (3) and Ms. Mitchell cannot show that First Transit's proffered reasons were pretextual (*see id.*). Ms. Mitchell did not respond in opposition to the motion for summary judgment, despite the court's ordering her to do so, and upon advising her of the summary judgment standard and the consequences of failing to respond to a motion for summary judgment (*see* ECF No. 42).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(E); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). After careful consideration of First Transit's motion for summary judgment and supporting documentation, the record, and the relevant case law, the undersigned recommends that First Transit's motion for summary judgment be granted.

I.     LEGAL STANDARDS

A.     Summary Judgment Standard

In order to prevail on its motion for summary judgment, First Transit must show that Ms. Mitchell has no evidence to support her case, or present affirmative evidence to show that Mitchell will be unable to prove her case at trial.  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L.  Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law."  *Id.*; *accord* Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). Further, the non-moving party must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  A mere "scintilla" of evidence or conclusory allegations are insufficient.  Celotex Corp., 477 U.S. at 324 (quoting Fed. R. Civ. P. 56).  The non-moving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.*; Owen v. Wille,

117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting <u>Celotex Corp.</u>, 477 U.S. at 324).  Evidence presented in opposition to a motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to the non-moving party.  <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1282 (11th Cir. 1999).  However, "[w]here the factual context renders the non-moving party's position implausible, it must come up with more persuasive evidence than would otherwise be necessary to defeat summary judgment."  <u>In re Fin'l Federated Title and Trust, Inc.</u>, 347 F.3d 880, 885 (11th Cir. 2003) (citation omitted).  A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>Celotex Corp.</u>, 477 U.S. at 322.

      B.     <u>Title VII Standard</u>

Title VII of the Civil Rights Act of 1964 explicitly prohibits race and sex discrimination in employment practices. 42 U.S.C. § 2000e-2(a). A plaintiff may establish a claim for employment discrimination through the use of direct, circumstantial, or statistical evidence. *See* Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary 596 (8th ed. 2004); *see also* Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1226 (11th Cir. 1993). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Id.* Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081–82 (11th Cir. 1990).

In a case in which the plaintiff relies on circumstantial evidence, which is the case here, the claim is evaluated using the three-step framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See* EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002). Under this framework, the plaintiff has the initial

burden of establishing a prima facie case of discrimination, thus creating a rebuttable presumption that an employer acted unlawfully. *See* Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). The Eleventh Circuit has noted that the method of establishing a prima facie case is not fixed, but rather is flexible and dependent on the employment situation. *Id.* (citation omitted). To establish a prima facie case of disparate treatment discrimination a plaintiff must generally show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) the employer treated similarly situated employees outside of the protected class more favorably; and (4) she was qualified to do the job. *See* Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1228 (11th Cir. 2002). Should the plaintiff fail to establish a prima facie case, summary judgment is warranted if there is no other evidence of discrimination. *See* Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citation omitted). The standard for demonstrating a prima facie case is not onerous, requiring "only that the plaintiff establish facts adequate to permit an inference of discrimination." *Id.* (citations omitted).

Once the plaintiff has established a prima facie case or shown some other evidence of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.

McDonnell Douglas, 411 U.S. at 802. This justification should be "clear, reasonably specific, and worthy of credence." Hall v. Ala. Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003). The employer, however, need not persuade the court that it was actually motivated by the proffered reason. *See* Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting Burdine, 450 U.S. at 254). Thus the defendant's burden is one of production, not persuasion. Wilson, 376 F.3d at 1087–88. The Eleventh Circuit has stated that this burden is "exceedingly light." Holifield, 115 F.3d at 1564 (quoting Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994)).

Once the employer satisfies its burden of production by articulating one or more legitimate, nondiscriminatory reasons for its action, the presumption of discrimination is eliminated and the burden of production shifts back to the plaintiff to offer evidence that the alleged reason is a pretext for illegal discrimination. Wilson, 376 F.3d at 1087. The plaintiff can establish that an employer's reasons are pretextual by showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs, 106 F.3d at 1538). "However, a reason

is not pretext for discrimination unless it is shown <u>both</u> that the reason was false, and that discrimination was the real reason." <u>Springer v. Convergys Customer Mgmt. Group Inc.</u>, 509 F.3d 1344, 1349 (11th Cir. 2007) (internal quotation marks and citations omitted). The plaintiff cannot succeed by simply quarreling with the wisdom of the employer's stated reason. *See* <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000) (quotation and citation omitted). Further, a plaintiff does not establish pretext by arguing that the defendant's decision was mistaken. *See* <u>Wilson</u>, 376 F.3d at 1092 (quoting <u>Lee v. GTE Fla., Inc.</u>, 226 F.3d 1249, 1253 (11th Cir. 2000)). Rather, she must show that the decision was motivated by the plaintiff's race or sex. *Id.*

Finally, despite the shifting of the burden of production between the plaintiff and the defendant under the <u>McDonnell Douglas</u> framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Wilson</u>, 376 F.3d at 1088 (quoting <u>Burdine</u>, 450 U.S. at 253). Because of this, even though a plaintiff may establish a prima facie case and set forth sufficient evidence to reject the defendant's explanation, if no rational factfinder could conclude that the employer's action was discriminatory, then summary judgment may be warranted. <u>Chapman</u>, 229 F.3d at 1025 n.11 (citing

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 147

L. Ed. 2d 105 (2000)).

## II.    MATERIAL FACTS FOR PURPOSES OF SUMMARY JUDGMENT

As this case comes before the court on First Transit's motion for summary

judgment, the court views the facts in the light most favorable to Ms. Mitchell, the

non-moving party.  See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th

Cir. 1993).  The court does so here, referring to First Transit's statement of undisputed

facts, and taking those facts from the parties' pleadings and summary judgment

materials of record.  Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1.  Nevertheless, the

court observes that what are stated as "facts" herein for purposes of summary

judgment review may not be the actual facts.  See Montoute v. Carr, 114 F.3d 181,

182 (11th Cir. 1997).

With regard to the factual positions asserted by the parties, the court must apply

the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which

provides in relevant part:

**(1) Supporting Factual Positions.**  A party asserting that a fact cannot
be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including
depositions, documents, electronically stored information,
affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

. . . .

**(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010). Allegations in a verified complaint, made under penalty of perjury, meet Rule 56's requirements for affidavits or declarations. *See* 28 U.S.C. § 1746; <u>Barker v. Norman</u>, 651 F.2d 1107, 1114–15 (5th Cir. Unit A July 1981)[3] (referring to affidavit requirements listed in Rule 56(c)(4)'s predecessor, Rule 56(e)). Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed.

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or

---

[3] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it. *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Applying these standards, the court conveys the following as the material facts. Ms. Mitchell, a black female, began her employment with Escambia County Area Transit ("ECAT") on September 15, 1985 (*see* Amended Complaint at 3, ECF No. 7; Deposition of Brenda Elaine Mitchell 26:19–24, Mar. 17, 2017, ECF No. 41-1). Ms. Mitchell was working as an Operations manager when First Transit began managing ECAT on April 1, 2012 (*see* Amended Complaint at 7; Mitchell Dep. 26:19–27:6; 28:3–6; 55:14–23). In connection with the management change, First Transit provided Ms. Mitchell with a copy of its Employee Handbook, which Mitchell acknowledged receiving on April 3, 3012 (Mitchell Dep. 107:6–25, Mitchell Dep. Ex. 7). Ms. Mitchell reviewed the policies in the handbook (Mitchell Dep. 108:1–16; 113:7–10). Section 7 of the Handbook contains a policy of General Rules and Employee Relations, which identifies certain types of conduct violations that "may be cause for discharge for a first offense," including "Insubordination; failure to follow instructions; defiance of instructions" (Mitchell Dep. Ex. 8, pp. 33).

Additionally, Section 11 of the Handbook sets forth a Performance Code, which identifies "unacceptable behaviors" (Mitchell Dep. Ex. 8, pp. 60–67). The Handbook provides four classes of infractions, Class 1, Class 2, Class 3, and Class 4 (*id.*). Class 1 infractions are considered the most serious offenses and unacceptable behaviors that "may result in further disciplinary actions, up to and including discharge on the first offense" (*id.*, p. 60). "Insubordination" is a Class 1 infraction and includes "improper conduct toward a supervisor or manager or refusal or failure to perform any job or work assignment given by a supervisor or manager" (*id.*, p. 62). A Class 1 infraction subjects an employee to discharge upon the first offense (*id.*, p. 67).

Class 2 infractions are considered "serious violations" of First Transit's performance code (Mitchell Dep. Ex. 8, p. 64). Engaging in any of the conduct identified as a Class 2 infraction "will subject an employee to suspension and final warning for the first offense in a rolling 12-month period" (*id.*). The following instances of misconduct are identified as Class 2 infractions:

- Discourteous or inappropriate attitude or behavior to passengers, other employees, or members of the public. Disorderly conduct during work hours.

- Profane or abusive language where the language used is uncivil, insulting, contemptuous, vicious, or malicious.

(Mitchell Dep., Ex. 8, p. 64). A Class 2 infraction subjects the employee to suspension on the first offense (*id.*, p. 67). A second Class 2 infraction within 12 months of the first Class 2 infraction subjects the employee to discharge (*id.*).

During First Transit's management of ECAT, the organization included the following five departments: (1) operations, (2) maintenance, (3) finance, (4) marketing, and (5) administration (Mitchell Dep. 40:15–41:2). Ms. Mitchell worked in the Operations Department, which was the largest and included bus and trolley operators (Mitchell Dep. 41:10–12; 43:15–44:11). When First Transit took over managing ECAT, Mary Lou Franzoni became the General Manager, which was the highest ranking position at ECAT (Mitchell Dep. 30:4–25). Dianne Hall, a white female, later became the Assistant General Manager ("AGM") of Operations, reporting to Ms. Franzoni (Mitchell Dep. 31:1–11; 32:14–23; Declaration of Dianne Hall ¶ 2, ECF No. 41-2). Shortly after Ms. Hall became the AGM, Ms. Franzoni, Ms. Hall, and Ken Vierling (AGM of Maintenance) met with Ms. Mitchell and offered her a position as Ms. Hall's assistant (Mitchell Dep. 31:1–8; 32:14–22). Ms. Mitchell was told she would be provided a job description and a pay raise at a later time (Amended Complaint at 4). The official title that Ms. Mitchell was later given was "Lead Supervisor" (Mitchell Dep. 33:18–34; 74:25–76:1; 76:21–77:3; Mitchell Dep. Ex. 5;

Hall Decl. ¶ 7).  This  promotion, which became effective August 19, 2012, resulted

in Mitchell's receiving a pay increase (Mitchell Dep. 34:2–6; 77:4–8; Hall Decl. ¶ 7).


For the remainder of her employment, Ms. Mitchell continued to work as Lead

Supervisor and reported to Diane Hall (Mitchell Dep. 87:3–9).  After Ms. Mitchell's

promotion, she believed that her job duties "didn't really change" (Mitchell Dep.

79:9–20; 86:6–17; *see also* 83:9–14).   Ms. Mitchell received training on two

additional duties, namely, assisting with the "WAR report" and the "run cut,"[4] but

Mitchell did not understand those tasks to necessarily be a part of her new job

(Mitchell Dep. 83:20–87:2).

Following her promotion, Ms. Mitchell and Ms. Hall met on an almost daily

basis (Hall Decl. ¶ 8; Mitchell Dep. 121:3–4).  According to Ms. Hall, during these

meetings they discussed Hall's expectations for the Operations Department, the daily

operations for the Department, Hall's informal feedback regarding Ms. Mitchell's

performance, and Hall's expectations for Mitchell's new position (Hall Decl. ¶ 8).

According to Ms. Hall, Ms. Mitchell's new position required that she perform

additional tasks beyond those previously performed in her prior role (*id*. ¶¶ 8–9).  For

---

[4] Ms. Mitchell described "run cut" to mean creating different routes for bus operators
(Mitchell Dep. 84:5–8).

example, in managing the overtime budget, Ms. Mitchell was responsible for ensuring that dispatch supervisors adhered to the Collective Bargaining Agreement between the Amalgamated Transit Union, Local 1395 ("Local Union"), and First Transit (*id.* ¶ 9). That agreement provided specific guidelines regarding the delegation of work to full-time and part-time vehicle operators (*id.*). Prior to delegating work to vehicle operators, the dispatch supervisor must evaluate, among other factors, the operator's seniority, whether the operator had already accrued overtime, and whether the operator was scheduled to be off duty (*id.*). As Lead Supervisor, Ms. Mitchell was ultimately responsible for overseeing the delegation of work assignments to vehicle operators (*id.*).

According to Ms. Mitchell, during the daily meetings with Ms. Hall, the two discussed "[e]verything that went on that day or was going to be coming up" (Mitchell Dep. 121:5–11). According to Ms. Mitchell, Ms. Hall never discussed Mitchell's job duties (*id.* 121:13–24).

In May of 2013, First Transit transferred General Manager Franzoni and replaced her with Harold Humphrey (Amended Complaint at 6; Hall Decl. ¶ 10). Mr. Humphrey had heightened expectations for the Operations Department and specifically had concerns regarding the overtime budget, on-time performance of

trolleys and buses, and route completions (Hall Decl. ¶ 10). Mr. Humphrey expressed to Ms. Hall his expectation that Hall would help lead the facility in improving in those areas (*id.*). Ms. Hall then began to implement more stringent standards as to on-time trip performance, schedule-adherence for trolleys and buses, and the reduction of overtime (*id.* ¶ 11). Ms. Mitchell and the dispatch supervisors were expected to meet these standards, which Ms. Hall communicated to them (*id.*).

In Ms. Hall's view, Ms. Mitchell failed to perform her job duties to Hall's satisfaction; therefore, Hall prepared a Performance Improvement Plan ("PIP") outlining Mitchell's performance deficiencies (Hall Decl. ¶ 12). On July 8, 2013, Ms. Hall presented Ms. Mitchell with the PIP (Mitchell Dep. 118:9–25, Mitchell Dep. Ex. 9; Hall Decl. ¶ 12). Ms. Hall reviewed the contents of the PIP with Ms. Mitchell, discussing specific areas necessitating improvement, including reducing overtime, monitoring dispatch boards, and monitoring and evaluating vehicle on-time statistics (Mitchell Dep. 119:24–120:6; Mitchell Dep. Ex. 9; Hall Decl. ¶ 13). The PIP notified Ms. Mitchell of the following:

> We must inform you that there is an expectation for your immediate and sustained performance improvement in order for you to remain employed with First Transit.
> . . . .

**Effective immediately, you are required to demonstrate improvement in meeting or exceeding the following performance expectations:**

❖ Reduce Over Time

It is expected that you begin immediate steps to reduce over time over the next 30 days.  This is to be achieved by:

- Monitoring dispatch boards throughout the day and adjusting staffing as needed
- Review current days [sic] boards to ensure operators have signed in and out
- Review boards for upcoming day to ensure appropriately staffed, i.e. enough or too many employees covering the board
- Every Monday a.m. review previous weeks [sic] payroll making sure Floating Holidays, Vacation are accounted for with Exception forms.

❖ Monitor and Evaluate Operations activities daily

- Vehicle on-time statistics
- Missed runs
- Ensure proper Pass-down procedures are practiced
- Total work hours
- Total pay hours
- Customer complaint data
- Adherence of Labor Agreement
- Ensure company policies and procedures are followed

❖ Accurate work

- Prepare accurate reporting, i.e. trip performance, trolley counts, on-time performance

■     This can be achieved by proof reading all outgoing work for accuracy, i.e. Choose-up/Job bids

. . . .

**Summary:**

It is expected that through this corrective action process, your performance will meet acceptable levels immediately. You job [sic] performance will be reviewed weekly to determine adequate progress. Failure to show immediate improvement in the aforementioned areas will result in disciplinary action, up to and including termination.

As you may know, employment with First Transit is "at will." This means that all employment relationships are at the mutual consent of the employee and the company. Accordingly, either you or the company can terminate the employment relationship at will, at any time, for any reason, either with or without cause or advance notice. The at-will nature of your employment shall remain unchanged during your tenure as an employee.

(Mitchell Dep. Ex. 9 (emphasis in original)).

When Ms. Hall presented Ms. Mitchell with the PIP, Mitchell expressed that the PIP was premature as she had not been given a written job description for her new position (Mitchell Dep. 119:24–120:6; 136:5–13; Mitchell Dep. Ex. 9; Hall Decl. ¶ 14). Later that day, Ms. Hall provided Ms. Mitchell with a written job description, which Hall had prepared one week earlier, on July 1, 2013, but had not provided to Mitchell until July 8, 2013 (Mitchell Dep. 87:14–88:8; 136:5–12, 18–25; Mitchell Dep. Ex. 6).

The next day, on July 9, 2013, Ms. Mitchell signed the PIP with reference to an attached letter she had prepared in response to the PIP (Mitchell Dep. 137:13–17, Mitchell Dep. Ex. 10). In the letter, Ms. Mitchell again expressed that the PIP was premature, because it suggested she had failed in performing assigned tasks, but she had not been previously provided a written job description which clearly specified Hall's expectations (Mitchell Dep. Ex. 10). Ms. Mitchell also expressed her desire to work hard, perform well, and "continuously grow" and provide quality transportation service to ECAT customers (*id.*). By signing the PIP, Ms. Mitchell acknowledged the following:

> I have read and understand my responsibilities and duties as outlined in this Performance Improvement Plan (PIP). I comprehend that is [sic] a very serious situation regarding my opportunity for future employment with First Transit and I also acknowledge that if I fail to demonstrate immediate improvement in any or all of the areas listed above, it may result in disciplinary action up to and including termination.

(Mitchell Dep. Ex. 9).

Around this time, Ms. Hall informed Ms. Mitchell that Mitchell's work station would be relocated from an office to the dispatch office (*see* Mitchell Dep. 198:2–7). Ms. Hall instructed a maintenance employee to relocate Ms. Mitchell's belongings to the dispatch office (Hall Decl. ¶ 16), and Ms. Mitchell was moved into the dispatch office on July 10, 2013 (Amended Complaint at 5). Ms. Hall believed that Ms.

Mitchell's presence in the dispatch office would enable Mitchell to more effectively ensure that dispatch supervisors (whom Mitchell supervised) were performing their tasks, and facilitate Mitchell's overall improvement with regard to oversight of the dispatch supervisors (Hall Decl. ¶ 16). According to Ms. Mitchell, the dispatch office was the center of activity in ECAT, and there were constant interruptions and distractions which made it difficult for her to concentrate and focus (Mitchell Dep. 198:4–199:20). The same day that Ms. Mitchell's work station was moved, Mitchell became ill and left work (Amended Complaint at 5; *see also* Hall Decl. ¶16). Mitchell returned to work eight days later, on July 18, 2013 (*see id.*).

Prior to issuance of the PIP, Ms. Mitchell and Ms. Hall got along well (Mitchell Dep. 97:3–9; 121:8–12; 134:14–20; 240:7–18; Ex. 20). According to Ms. Hall, after issuance of the PIP, Ms. Mitchell became uncooperative and began to question Hall's expectations for the Operations Department and second-guess her decision-making (Hall Decl. ¶ 17).

On August 12, 2013, Ms. Mitchell went to Ms. Hall's office and asked if there was "anything we need to do" (Mitchell Dep. 139:7, 16–20). The two discussed the PIP and, more specifically, eight items, one of which was overtime (Hall Decl. ¶ 18;

*see also* Mitchell Dep. Ex. 11).[5]  According to Ms. Mitchell, Ms. Hall told Mitchell

that they would work together to "keep overtime down" (Mitchell Dep. 140:17–19).

Ms. Hall presented Mitchell with the "work board" for Sunday, August 11, 2013,

which showed that Gwen McCormick worked 10:00 a.m. to 1:00 p.m. (Mitchell Dep.

---

[5] According to a Record of Discussions and Actions prepared by Ms. Mitchell during this meeting, she and Ms. Hall discussed the following items:

(1) OT—She [Ms. Hall] said we will work together to keep OT down.  She presented the work boards for Sunday 8/11/2013.  The board revealed Gwen McCormick worked 10:00 a.m.–1:00 p.m. covering the board.  This work will be paid @ OT if McCormick, who is a regular operator, does not miss a day work [sic], miss hours because she has an assigned job for 40 hours already.

I questioned Dianne about that because my concern was I was not here Saturday nor was I here Sunday.

She understood and realize [sic] Chetwynde was here and he did the board.  I told Dianne I disagree with Gwen report [sic] to work when there were PT operator [sic] available to do the job.  She agreed and told me I should talk to him (Chet) about it and let him know to adhere to the labor agreement.

(2)  Asure [sic] dates are correct of sign out & work board sheets

(3)  The exception forms should come to me for review

(4)  I should be able to provide "Missed Route" information @ request

(5)  Make sure there is proper pass down

(6)  Know total hours work

(7)  Complaints—still working on a system

(8)  Check the "Need to Sign" all day.  Supervisor should do this

(Mitchell Dep. Ex. 11).

140:19–21; *see also id.* 142:13–21).  Ms. Mitchell discussed with Ms. Hall that if Ms.

McCormick continued to work as scheduled, she would be entitled to overtime pay

for those three hours (Mitchell Dep. 140: 21–25).

On September 13, 2013, Ms. Mitchell and Ms. Hall again met to discuss

overtime, because the Operations Department was exceeding the overtime budget

(Hall Decl. ¶ 19).  Ms. Mitchell claimed that the overtime budget was high due to a

number of vehicle operators being on vacation (*id.*).  Ms. Hall asked Ms. Mitchell

whether she was reviewing the daily dispatch boards to track work assignments to

operators, and Ms. Mitchell responded, "Yes." (*id.*).

On September 24, 2013, Ms. Hall and Ms. Mitchell again discussed the

overtime issue, and Ms. Mitchell again explained that the overtime budget was high

due to a number of vehicle operators being on vacation (Hall Decl. ¶ 20).  Ms. Hall

questioned Mitchell's explanation, because Mitchell was expected to use eligible part-

time operators to reduce overtime instead of assigning additional work to full-time

operators who would accrue overtime (*id.*).  Ms. Hall also reminded Ms. Mitchell that

reducing overtime was one of the areas of improvement contained in Mitchell's PIP

(*id.*).  Ms. Hall also discussed with Ms. Mitchell two employees' concerns that

Mitchell was showing favoritism to a particular employee, Janet Brooks, by approving

Ms. Brooks' time-off request but denying their requests (*id.*). Ms. Hall reminded Ms. Mitchell of her responsibility to be impartial and to approve or deny time-off requests in accordance with the Collective Bargaining Agreement between First Transit and the Local Union (*id.*).

On September 25, 2013, the 9:00 a.m. and 11:00 a.m. buses for a special event were not on time (Hall Decl. ¶ 21). As a dispatch supervisor, Ron Chetwynde was responsible for monitoring on-time trip performance and ensuring that bus operators adhered to their schedules (*id.*). As Lead Supervisor, Ms. Mitchell was responsible for overseeing the dispatch supervisors' job performance, and Mitchell was ultimately accountable for dispatch supervisors' mistakes (*id.*). Ms. Mitchell and Ron Chetwynde each received a verbal warning in connection with this incident (*id.*).

On October 9, 2013, Ms. Mitchell initiated a meeting with Ms. Hall (Complaint at 5, ECF No. 1; *see also* Amended Complaint at 5; Mitchell Dep. 153:7–20; 154:11–156:25). According to Ms. Mitchell, she initiated the meeting "to get answers from her and to clear up an error she [Hall] and Greg Thomas made" (*id.*). Specifically, Ms. Mitchell brought up the fact that a dispatch supervisor, Greg Thomas, improperly delegated work to bus operator Gerri Bell instead of Janet Brooks, which resulted in Ms. Bell's entitlement to overtime pay, and that Ms. Hall

had approved the overtime pay (Mitchell Dep. 153:7–20; Hall Decl. ¶ 22). Ms. Mitchell told Ms. Hall that she disagreed with Hall's decision to pay Ms. Bell overtime pay, that monitoring overtime was one of Mitchell's responsibilities pursuant to the PIP, and that she (Mitchell) "stood firm on her decision not to pay" Ms. Bell overtime (Mitchell Dep. 154:11–156:25; 228:3–19; 233:9–24, *see also* Mitchell Dep. Ex. 17). Ms. Hall responded that she recognized Greg Thomas' mistake, and she (Hall) had already counseled him for the error (Hall Decl. ¶ 22). Ms. Hall explained to Ms. Mitchell that because the issue of the delegation of work to Gerri Bell was not raised in a timely fashion, Ms. Bell had completed the route and was thus entitled to overtime pay (*id.*). Ms. Hall also told Mitchell that two other bus operators had to be paid for overtime due to similar problems with improperly delegating work (*id.*). Ms. Hall reiterated that Ms. Mitchell, as Lead Supervisor, was ultimately responsible for managing the dispatch board and identifying issues concerning the delegation of work to vehicle operators (Hall Decl. ¶ 22). Ms. Hall told Ms. Mitchell that because Mitchell had failed to effectively monitor the dispatch boards, it was now her (Mitchell's) responsibility to create the dispatch boards (*id.*). Ms. Mitchell voiced her opposition to assuming that responsibility, and argued that it was the dispatch supervisor's job, not hers, to prepare the dispatch boards (*id.*).

Ms. Mitchell and Ms. Hall discussed another issue during the October 9 meeting (*see* Mitchell Dep. 157:8–158:17). During the meeting, Ms. Hall became upset (*see* Complaint at 3), and told Ms. Mitchell that Greg Thomas had expressed concern about Mitchell's statements to another dispatch supervisor, Ken Edgerton, regarding Thomas' reporting things to Hall (Hall Decl. ¶ 23; Complaint at 3). Ms. Mitchell responded, "Huh?" and questioned Hall about Mr. Thomas' statements (Mitchell Dep. 158:17–20; Hall Decl. ¶ 23). Ms. Hall declined to answer Mitchell's questions, and instead told Mitchell they would discuss the matter with Mr. Thomas when he arrived at the office (Mitchell Dep. 158 20–21; Hall Decl. ¶ 23). Ms. Mitchell agreed to the meeting but demanded that Ken Edgerton attend as well, stating, "Well, no, if you said Ken was involved to, I think Ken should be there too so we can all talk about it." (Mitchell Dep. 158:22–24; 160:10–22; 227:1–15; Hall Decl. ¶ 23). Ms. Hall replied, "I see you're getting upset" and told Mitchell to leave her office (Mitchell Dep. 158:25–159:1; *see also* Hall Decl. ¶ 23). Ms. Mitchell responded, "What?" (Mitchell Dep. 159:3–4; *see also* Hall Decl. ¶ 23). Ms. Hall said, "You're upset" (Mitchell Dep. 159:4). Ms. Mitchell responded, "No, Dianne, you look like you're a little bit more upset than I am. I'm just trying to get some understanding." (Mitchell Dep. 159:4–6; *see also* Hall Decl. ¶ 23). Ms. Hall again

told Ms. Mitchell to leave her office (Mitchell Dep. 159:7; Hall Decl. ¶ 23). Ms. Mitchell walked out and, after taking three or four steps down the hall, called Ms. Hall "crazy" (Mitchell Dep. 159:7–10; Hall Decl. ¶ 23). Ms. Mitchell went to her desk in the dispatch office, and shortly thereafter, Ms. Hall told her to leave for the day (Mitchell Dep. 160:3–5; Hall Decl. ¶ 24).

Ms. Hall consulted with Mr. Humphrey, the General Manager, regarding the appropriate disciplinary action to take against Ms. Mitchell (Hall Decl. ¶ 25). Ms. Hall recommended Ms. Mitchell's termination (*id.*). Hall prepared a discharge checklist, which Mr. Humphrey approved and, in turn, sent to First Transit's Human Resources Department for final approval (*id.*). First Transit's Human Resources is located off-site and generally must be consulted in decisions involving an employee's potential termination (*id.*). Thereafter, Human Resources Manager Melissa Cole approved Ms. Mitchell's termination (*id.*).

Ms. Hall prepared a termination letter to provide to Ms. Mitchell (Hall Decl. ¶ 26). Ms. Hall telephoned Ms. Mitchell on October 10, 2013, and they scheduled a meeting for October 11, 2013 (Mitchell Dep. 162:21–25). The October 11, 2013, meeting was attended by Ms. Hall, Tonya Ellis (the Marketing Manager), Ms.

Mitchell, and Ms. Mitchell's adult daughter (Mitchell Dep. 163:6–164:9; 165:21–23;

Hall Decl. ¶ 26). During the meeting, Ms. Hall read the following termination letter:

> In July 2013 you were placed on a Personal Improvement Plan. This
> plan was initiated as an effort to improve the quality of your work. Over
> the next several months we met to discuss your progress as it pertained
> to the PIP. Our most recent meeting was Tuesday October 8, 2013
> w[h]ere you demonstrated your unwillingness to follow direction. Due
> to your actions your employment is being terminated effective October
> 11, 2013.

(Mitchell Dep. 164:11; Hall Decl. ¶ 26; Hall Decl. Ex. A). Later that day, Ms. Hall

mailed the termination letter to Ms. Mitchell (Hall Decl. ¶ 27).

First Transit's corporate management subsequently informed Ms. Hall that the

termination letter contained an administrative error (Hall Decl. ¶ 28). Specifically,

Ms. Hall inadvertently referenced the wrong meeting date, stating that the meeting

occurred on October 8 instead of October 9 (*id.*). Thereafter, Ms. Hall corrected the

error and, on October 30, 2013, mailed a second termination letter to Ms. Mitchell,

which included the correct date but was unchanged in all other respects (*id.*).

III.    DISCUSSION

Ms. Mitchell alleges that relocating her work station to the dispatch room was

discriminatory. However, even assuming that Ms. Mitchell could establish that

moving her work station qualified as an adverse employment action, she cannot

demonstrate she was treated less favorably than a similarly situated white or male employee. Ms. Mitchell alleges Keith Ivey, a white male, was the assistant to Ken Vierling, the AGM of Maintenance (Mitchell Dep. 197:13– 201:7; 202:17–22). Mitchell alleges Keith Ivey's work station was moved to an area that was quieter and more secluded in the Maintenance Department; whereas, Mitchell's work station was moved to the dispatch office where there were distractions (*id.*).

Ms. Mitchell cannot establish that she was similarly situated to Keith Ivey. Mitchell acknowledges that Mr. Ivey worked for a different supervisor in a different department. Mr. Ivey worked for Ken Vierling, the Assistant General Manager of Maintenance; whereas, Ms. Mitchell worked for Ms. Hall, the Assistant General Manager of Operations. Additionally, there is no evidence that Mr. Ivey had performance issues; whereas, at the time Mitchell's work station was moved (on July 10, 2013), Mitchell had been given the PIP (on July 8, 2013), which identified specific areas necessitating improvement, including reducing overtime by monitoring dispatch boards and adjusting staffing as needed (*see* Mitchell Dep. Ex. 9). Ms. Hall believed that Ms. Mitchell's presence in the dispatch area would enable Mitchell to more effectively ensure that dispatch supervisors were performing their tasks, and facilitate Mitchell's overall improvement with regard to oversight of the dispatch supervisors.

Although Ms. Mitchell disagreed with Ms. Hall's decision and her reasoning, Mitchell has not shown that Ms. Hall's reason for moving her was a pretext for race or sex discrimination.

As previously discussed, Ms. Mitchell can establish that her employer's reasons for moving her work station are pretextual by showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Cooper, 390 F.3d at 725. "However, a reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." Springer, 509 F.3d at 1349. Ms. Mitchell cannot succeed by simply quarreling with the wisdom of her employer's stated reason. *See* Chapman, 229 F.3d at 1030. Rather, Ms. Mitchell must show that the decision was motivated by her race or sex. *See* Wilson, 376 F.3d at 1092. Ms. Mitchell has not done so. Therefore, she failed to establish a prima facie case of discrimination with respect to relocating her work station.

To the extent Ms. Mitchell alleges First Transit discriminated against her by placing her on a PIP, she cannot establish a prima facie case of discrimination. Ms.

Mitchell did not identify any employee outside her protected class who was similarly situated and treated more favorably than she.

Ms. Mitchell also alleges First Transit discriminated against her by terminating her employment. Ms. Mitchell alleges after she was terminated, First Transit hired a white male for the position of scheduler, and promoted a black female, Gerri Bell, to the position of dispatch supervisor (Amended Complaint at 6). Ms. Mitchell cannot demonstrate she was treated less favorably than a similarly situated employee outside her protected class. The white male hired as a scheduler is not a comparator, because he was hired for the position of scheduler, which is a different position than Ms. Mitchell's. The same is true of Ms. Bell—she was promoted to a different position than the one held by Ms. Mitchell. Additionally, Ms. Bell is a black female and thus a member of Ms. Mitchell's protected class. Therefore, Ms. Bell's promotion cannot support Ms. Mitchell's claim of race and sex discrimination.

Ms. Mitchell next alleges First Transit discriminated against her by terminating her instead of applying progressive discipline (*see* Amended Complaint at 6–7). Ms. Mitchell again uses Gerri Bell as a comparator (*see id.*). However, as previously discussed, Ms. Bell is a member of Mitchell's protected class. Therefore, Mitchell

cannot establish a prima facie case of discrimination by using Ms. Bell as a comparator.

Ms. Mitchell also uses Ron Chetwynde, a white male dispatch supervisor, as a comparator. Ms. Mitchell alleges in December of 2012, Mr. Chetwynde made "violent comments" to then-General Manager Mary Lou Franzoni (Amended Complaint at 6–7). Ms. Mitchell alleges Mr. Chetwynde was "written up" and given a "Last Chance Agreement"; whereas Mitchell was terminated (*id.*).

When First Transit took over the management of the Pensacola facility in approximately April of 2012, Ron Chetwynde was a dispatch supervisor and remained in that position through the end of Ms. Mitchell's employment with First Transit (Declaration of Kristy Baccile ¶ 10; ECF No. 31-3). Mr. Chetwynde's employment ended on or around February 6, 2014 (*id.*). Kristy Baccile, a Human Resources Director–Region, was involved in the administration of each of Mr. Chetwynde's disciplinary actions (*id.* ¶¶ 1, 11). Ms. Baccile was not involved in the decision to terminate Ms. Mitchell (*id.* ¶ 5).

On January 7, 2013, Mr. Chetwynde was placed on a twelve-month Last Chance Agreement for "unacceptable personal conduct involving profane or abusive language," involving what management believed was a potential threat of violence

(Baccile Decl. ¶ 12). Based on his comment, which Mr. Chetwynde claimed was a joke, Ms. Franzoni (General Manager at the time) recommended that Mr. Chetwynde be placed on a Last Chance Agreement (*id.*). Ms. Baccile approved Ms. Franzoni's recommendation (*id.*). Mr. Chetwynde was subsequently placed on the Last Chance Agreement, a copy of which is attached to Ms. Baccile's Declaration (Baccile Decl. Ex. A).

According to Mr. Chetwynde's Last Chance Agreement, on more than one occasion, Mr. Chetwynde exhibited unacceptable personal conduct including profane or abusive language where the language used was uncivil, insulting, contemptuous, vicious, or malicious (a Class 2 infraction) (Baccile Decl. Ex. A ¶ 1). In addition, Mr. Chetwynde made an oral threat of violence to other employees (*id.*). Pursuant to the Last Chance Agreement, in lieu of terminating Mr. Chetwynde's employment, Chetwynde agreed that the conduct underlying his first Last Chance Agreement would be reflected as a Class 1 infraction in his disciplinary record (*id.* ¶ 2). Mr. Chetwynde was placed on a twelve-month period of probation during which he was required to refrain from any similar unacceptable personal conduct including any use of profane language (*id.* ¶¶ 2, 3). Pursuant to the Last Chance Agreement, if Mr. Chetwynde violated the provisions of the Agreement whatsoever, his employment would be

immediately terminated, without any progressive discipline or further reconsideration (*id.* ¶ 4).

In June of 2013, following issuance of the Last Chance Agreement, Mr. Chetwynde was suspended for three days for using profanity at the workplace (a Class 2 infraction) (Baccile Decl. ¶ 13). In connection with that incident, Ms. Hall and Mr. Humphrey (who succeeded Ms. Franzoni as General Manager) recommended Mr. Chetwynde's termination (Hall Decl. ¶ 32; Baccile Decl. ¶ 13). Ms. Baccile declined their recommendation because she did not think the circumstances of utilizing profanity in response to work-related stress, not directed at any person, warranted termination (Baccile Decl. ¶ 13). Mr. Chetwynde was suspended for three days in lieu of termination (*id.*). The letter from Ms. Hall to Mr. Chetwynde, dated June 26, 2013, is attached to Ms. Baccile's Declaration (Baccile Decl. Ex. B).

In October of 2013, Mr. Chetwynde failed to adhere to the schedule for an event (a Class 2 infraction) (Hall Decl. ¶ 33; Baccile Decl. ¶ 14). This is the event which also involved Ms. Mitchell and, as previously noted, both Mr. Chetwynde and Ms. Mitchell received verbal counseling (Hall Decl. ¶ 33; Baccile Decl. ¶ 14; Baccile Decl. Ex. C).

On November 13, 2013, Mr. Chetwynde was issued a renewed Last Chance Agreement for engaging in discourteous and inappropriate behavior (a Class 2 infraction), which included allegations of hanging up on an office manager and making an inappropriate comment about Ms. Hall and Mr. Humphrey to another employee (Hall Decl. ¶ 34; Baccile Decl. ¶ 15). After this incident, Ms. Hall and Mr. Humphrey again recommended Mr. Chetwynde's termination (Hall Decl. ¶ 34). Ms. Baccile discouraged them from terminating his employment, because Mr. Chetwynde denied making inappropriate comments and hanging up on the office manager, claiming that he believed the call had ended when he hung up (Hall Decl. ¶ 34; Baccile Decl. ¶ 15). Mr. Chetwynde was instead placed on a renewed Last Chance Agreement, a copy of which is attached to Ms. Baccile's Declaration (Baccile Decl. ¶ 15; Baccile Decl. Ex. D).

According to the Renewed Last Chance Agreement, in lieu of terminating Mr. Chetwynde's employment, he was charged with discourteous or inappropriate attitude or behavior to passengers, other employees, or members of the public (a Class 2 infraction) (Baccile Decl. Ex. D ¶ 2). Mr. Chetwynde was suspended without pay for two days and placed on a twelve-month period of probation during which he was required to "refrain from any serious policy infraction" (*id.* ¶ ¶ 2, 3). Pursuant to the

Last Chance Agreement, if Mr. Chetwynde violated "any serious policy whatsoever," his employment would be immediately terminated, without any progressive discipline or further reconsideration (*id.* ¶ 4).

While Mr. Chetwynde was on the Renewed Last Chance Agreement, it was reported that he had displayed a discourteous and unprofessional and attitude toward a vendor (a Class 2 infraction) (Hall Decl. ¶ 35; Baccile Decl. ¶ 16). Ms. Hall and Mr. Humphrey recommended that Mr. Chetwynde be terminated (*id.*). Ms. Baccile suggested that Mr. Chetwynde be given the option of accepting a lesser disciplinary action in the form of a demotion to a part-time vehicle operation position (*id.*). Mr. Chetwynde initially accepted the demotion, but later changed his mind and his employment was terminated effective February 6, 2014 (*id.*).

With regard to disciplinary actions, courts determine whether other employees are "similarly situated" to the plaintiff by evaluating whether the comparators "are involved in or accused of the same or similar conduct and are disciplined in different ways." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (internal quotation marks and citation omitted). In doing so, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

*Id.* at 1373–74 (internal quotations marks and citation omitted). Additionally, "[d]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1261 n.5 (11th Cir. 2001); *see also* Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."); Chp. 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1257 (11th Cir. 2012).

Comparing Ms. Mitchell and Mr. Chetwynde, Ms. Mitchell was not similarly situated to Mr. Chetwynde when she was terminated. First Transit's reason for terminating Ms. Mitchell was that she was placed on a PIP in July of 2013, in an effort to improve the quality of her work, and Mitchell "demonstrated [ ] unwillingness to follow direction" (according to Mitchell's termination letter) in her last meeting with Ms. Hall, her supervisor. In that last meeting, Ms. Mitchell challenged Ms. Hall's decision making (on the issue of paying Gerri Bell overtime), Mitchell voiced her opposition to Hall's direction that Mitchell assume responsibility for creating the dispatch boards, and Mitchell called Ms. Hall "crazy." Ms. Mitchell's conduct fell well within the definition of "insubordination" as defined in the Employee Handbook,

which was a Class 1 infraction subjecting her to discharge upon the first offense.  By comparison, Mr. Chetwynde was never accused of insubordination.

Additionally, there is no evidence that Mr. Chetwynde was on a PIP when he committed any of his conduct infractions.  But even if Mr. Chetwynde's Last Chance Agreement equated to a PIP, there is no evidence that Chetwynde committed a Class 1 infraction during his period of probation.  All of Mr. Chetwynde's infractions were Class 2 infractions.  Although Mr. Chetwynde agreed that the conduct underlying his first disciplinary action would be reflected as a Class 1 infraction in his disciplinary record, the conduct itself, as described in the Last Chance Agreement, qualified as a Class 2 infraction not a Class 1 infraction, according to the Handbook.

A third difference between Ms. Mitchell and Mr. Chetwynde is that the ultimate decision maker with respect to Ms. Mitchell's termination was different than the ultimate decision maker with respect to all of Mr. Chetwynde's disciplinary actions. Human Resources Manager Melissa Cole approved Ms. Hall and Mr. Humphrey's recommendation to terminate Ms. Mitchell.  Human Resources Manager-Region Kristy Baccile was not involved in the decision to terminate Ms. Mitchell.  In contrast, Ms. Baccile was the ultimate decision-maker in all of the disicplinary decisions involving Mr. Chetwynde.  Ms. Baccile approved the first recommendation (by Ms.

Franzoni, who was Mr. Humphrey's predecessor), that Mr. Chetwynde be placed on

a Last Chance Agreement (on January 7, 2013). Thereafter, Ms. Baccile consistently

rejected all of Ms. Hall and Mr. Humphrey's recommendations to terminate Mr.

Chetwynde.

Moreover, even assuming that Ms. Mitchell established a prima facie case with

respect to her termination, First Transit proffered legitimate reasons for terminating

her employment, and Mitchell has failed to come forward with evidence that the

reasons are mere pretext. Initially, there simply is no evidence at all of discriminatory

animus. Ms. Mitchell admitted throughout her deposition that during the entire period

of her employment with First Transit, she never heard Ms. Hall, Mr. Humphrey or any

other employee make any statement that was derogatory or negative with regard to her

(or anyone else's) race or sex (*see* Mitchell Dep.).

Further, there is no evidence that First Transit's reasons for terminating Ms.

Mitchell's employment were false. Months prior to her termination, Ms. Mitchell was

placed on the detailed PIP, which identified areas of her job performance which

required improvement, and put her on notice that her failure to improve may subject

her to termination. Although Ms. Mitchell apparently felt that her PIP was unjustified

and premature (because she was not provided a formal job description prior to

issuance of the PIP), an employee cannot defeat summary judgment by quibbling with the employer's reasons for its decision where the reasons are ones that might motivate a reasonable employer. *See* <u>Alvarez v. Royal Atl. Developers</u>, 610 F.3d 1253, 1265–66 (11th Cir. 2010) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."); *id.* at 1266 ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head."); <u>Wilson</u>, 376 F.3d at 1092 (concluding that the plaintiff's "self-serving assertion that she was not insubordinate" was insufficient to establish pretext and reasoning that "whether [her] conduct was insubordinate is not an issue for this Court to referee."). Further, it is clear from Ms. Mitchell's own testimony that she was insubordinate—overtly declining to follow her supervisor's directions, challenging her supervisor's decision-making, and calling her supervisor "crazy." Ms. Mitchell thus failed to present any evidence that First Transit's reason for terminating her was a pretext for race or sex discrimination.

IV.    CONCLUSION

Applying the correct standard, the undisputed evidence establishes that First Transit is entitled to judgment as a matter of law on Ms. Mitchell's race and sex discrimination claims, which are the only claims remaining in this lawsuit.  Ms. Mitchell failed to establish a prima facie case of race or sex discrimination and/or failed to show that First Transit's proffered reasons for disciplining and terminating her were mere pretext for race or sex discrimination.  Summary judgment in First Transit's favor is, therefore, appropriate.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Defendant's motion for summary judgment (ECF No. 41) be **GRANTED**; and

2.      That the clerk of court be directed to enter judgment in favor of Defendant and against Plaintiff and close the file.

At Pensacola, Florida this 8th day of August 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**